**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

GOLDIE MEDICK,

                    Plaintiff,

      v.

                                  5:16-CV-341
CAROLYN M. COLVIN, COMMISSIONER    (CFH)
OF SOCIAL SECURITY,

                    Defendant.

_____

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| Law Offices of Steven R. Dolson | STEVEN R. DOLSON, ESQ. |
| 126 N. Salina Street, Ste. 3B | |
| Syracuse, New York 13202 | |
| Attorneys for Plaintiff | |
| | |
| Social Security Administration | ANDREEA L. LECHLEITNER, ESQ. |
| Office of Regional General Counsel, | |
| Region II | |
| 26 Federal Plaza, Rm. 3904 | |
| New York, New York 10278 | |
| Attorneys for Defendant | |

**CHRISTIAN F. HUMMEL,**
**U.S. MAGISTRATE JUDGE**

## MEMORANDUM-DECISION AND ORDER

Plaintiff Goldie Medick brings this action pursuant to 42 U.S.C. § 405(g) seeking

review of a decision by the Commissioner of Social Security ("Commissioner" or

"defendant") denying her applications for supplemental security income benefits ("SSI")

and disability insurance benefits. Dkt. No. 1 ("Compl.").[1] Plaintiff moves for a finding of

disability, and the Commissioner cross moves for a judgment on the pleadings. Dkt.

_____

[1] Parties consented to direct review of this matter by a Magistrate Judge pursuant to 28 U.S.C. §
636(c), FED. R. CIV. P. 73, Local Rule 72.2(b), and General Order 18. Dkt. No. 5.

Nos. 9, 11.  For the following reasons, the determination of the Commissioner is remanded.

# I. Background

Plaintiff was born on January 20, 1980.  T at 29.  Plaintiff graduated from high school and completed a vocational training program for nursing.  Id.  Plaintiff obtained her nursing license, and worked as a nurse (LPN) until 2007.  Id.  Plaintiff once worked as a hotel front desk clerk.  Id. at 43.  Plaintiff is 5'7" tall, and weights approximately 370 pounds.  Id. at 30, 320.  Plaintiff has a driver's license and is able to drive.  Id.  Plaintiff last worked in 2007 as an LPN.  Id. at 30.  Plaintiff protectively filed a Title II application for disability and disability insurance benefits, and a Title XVI application for supplemental security income on March 19, 2013.  Id. at 168-69; 187-197.[2]  Plaintiff alleged disability beginning on January 13, 2011.  Id. at 187.  These applications were denied on July 3, 2013.  Id. at 51-59; 72-76.  Plaintiff filed a request for a hearing, and a hearing was held on August 19, 2014.  Id. at 24-50, 92-93.  On October 21, 2014, Administrative Law Judge ("ALJ") Joseph J. Brinkley determined that plaintiff was not disabled.  Id. at 10-20.  Plaintiff's timely request for review by the Appeals Council was denied, making the ALJ's findings the final determination of the Commissioner.  Id. at 1-4.

# II. Discussion

---

[2]  Plaintiff filed a prior application for benefits, which was denied on June 2, 2011.  T at 187.

## A. Standard of Review

In reviewing a final decision of the Commissioner, a district court may not determine de novo whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)). The substantial evidence standard is "a very deferential standard of review . . . . [This] means once an ALJ finds facts, we can reject [them] only if a reasonable factfinder *would have to conclude otherwise*." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (internal quotation marks omitted). Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, the decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence. Martone v. Apfel, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (citing Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)). However, if the correct legal standards were applied and the ALJ's finding is supported by substantial evidence, such finding must be sustained, "even where substantial evidence may support the plaintiff's position and despite that the court's independent

3

analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citation omitted).

## B. Determination of Disability

"Every individual who is under a disability shall be entitled to a disability . . . benefit . . . ." 42 U.S.C. § 423(a)(1). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." Id. § 423(d)(1)(A). A medically-determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience. Id. § 423(d)(2)(A). Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3). Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience." Ventura v. Barnhart, No. 04-CV-9018 (NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based on 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

First, the [Commissioner] considers whether the claimant is

currently engaged in substantial gainful activity.

If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities.

If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity.

Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.

Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry, 675 F.2d at 467 (spacing added). The plaintiff bears the initial burden of proof to establish each of the first four steps. DeChirico v. Callahan,134 F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467). If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere. Id. at 1180 (citing Berry, 675 F.2d at 467).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)). However, a court

cannot substitute its interpretation of the administrative record for that of the

Commissioner where the record contains substantial support for the ALJ's decision.

See Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).  If supported by substantial

evidence, the Commissioner's finding must be sustained "even where substantial

evidence may support the plaintiff's position and despite that the court's independent

analysis of the evidence may differ from the [Commissioner's]."  Rosado v. Sullivan,

805 F. Supp. 147, 153 (S.D.N.Y. 1992).  The Court must afford the Commissioner's

determination considerable deference, and may not substitute "its own judgment for

that of the [Commissioner], even if it might justifiably have reached a different result

upon a de novo review."  Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037,

1041 (2d Cir. 1984).


## C.  ALJ Decision

Applying the five-step disability sequential evaluation, the ALJ determined that

plaintiff had not engaged in substantial gainful activity from January 13, 2011, the

alleged onset date, through October 21, 2014, the date of the decision.[3]  T at 12.  The

ALJ found at step two that plaintiff had the severe impairments of obesity, systemic

lupus erythematosus ("SLE"),[4] fibromyalgia, diabetes mellitus, hypertension, neuropathy

---

[3]  The Court notes that the pages in the ALJ's decision are out of order, and that the error in pagination appears in the original administrative transcript.  For the decision to follow in a logical fashion, one must read page 17 before page 18.  See T. at 17-18.

[4]  "Systemic lupus erythematosus (SLE) is a chronic, multisystem, inflammatory disorder of the autoimmune etiology, occurring predominately in young women.  Common manifestations may include arthralgias and arthritis; malar and other skin rashes; pleuritis or pericarditis; renal or CNS involvement; and hematologic cytopenias.  Diagnosis requires clinical and seriologic criteria."  THE MERCK MANUAL OF

secondary to diabetes, supraventricular tachycardia,[5] headache pain, patellefemoral/lateral compartment chondrosis,[6] and degenerative signal antero-or lateral meniscus.  Id.  At step three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Id. at 13.  The ALJ then concluded that plaintiff retained the residual functional capacity ("RFC") to:

> perform light work, as defined in 20 CFR 404.1567(b) and 416.967(b), except that the claimant: can occasionally use the upper extremities to engage in overhead reaching, pulling, pushing, and lifting; can frequently use the upper extremities to handle, grasp, finger, and feel bilaterally.  She can also occasionally use the lower extremities to repetitively operate foot/leg controls.  She can occasionally kneel, stoop, bend, and climb stairs/ramps, but must never clumb ladders/ropes/scaffolds or crawl.  She must also avoid concentrated exposure to extreme hot or cold temperatures, wetness, humidity, vibrations, and work hazards such as unprotected height and dangerous machinery.  Further, she is limited to an office, noise level environment.  In addition, she is limited to unskilled tasks.

Id. at 13.  At step four, the ALJ determined that plaintiff is unable to perform any past

---

DIAGNOSES AND THERAPY 305 (19th ed. 2011).

[5]  Superventricular tachycardia (SVT) is "rapid heart rate due to a pacemaker anywhere above the ventricular level, i.e., sinus node, atrium, atrioventricular junction.  The QRS complexes are always narrow unless there is rate-related aberrancy or preexisting intaventricular conduction delay."  STEDMAN'S MEDICAL DICTIONARY 1931 (28th ed. 2006).

[6]  Patellofemoral chondrosis is "the softening or loss of smooth cartilage covering the back of the kneecap.  MOSBY'S MEDICAL DICTIONARY 1343 (9th ed. 2013).

relevant work.  Id. at 17.[7]  Considering plaintiff's RFC, age, education, and work

experience, together with the Medical-Vocational Guidelines, the ALJ further concluded

that there were jobs existing in the national economy that plaintiff was able to perform.

Id. at 19.  The ALJ considered the testimony of a vocational expert ("VE"), and

concluded that, pursuant to SSR 00-4p, the VE's testimony was consistent with the

Dictionary of Occupational Titles ("DOT").  Id.  Thus, the ALJ concluded that plaintiff

could perform the jobs of office helper, order clerk, or envelope addresser, and that

these jobs exist in significant numbers within the national economy.  Id.  Therefore, the

ALJ determined that plaintiff "has not been under a disability, as defined under the

Social Security Act, from January 13, 2011, the alleged onset date, to the date of the

decision.  Id.

### D.  Arguments

Plaintiff contends that the ALJ's decision is not based on substantial evidence

due to two reversible errors:  (1) the ALJ improperly accounted for the position of a

single decision maker, and (2) the ALJ failed to follow the treating physician rule with

regard to the opinions of Dr. Satterly and Dr. Neupane.  See generally Dkt. No. 9.

Defendant argues that the ALJ properly applied the treating physician rule.  Dkt. No. 11.

---

[7]  The ALJ noted that plaintiff was born on January 20, 1980 "which is defined as a younger individual 18-49 on the alleged disability onset date," and indicated that plaintiff "subsequently changed age category to closely approaching advanced age."  T at 17.  As plaintiff was born in 1980, at the time of the ALJ's decision, plaintiff would have been 34.  It appears that the ALJ's notation that plaintiff changed age categories is a typographical error.  Regardless, as it does not appear that the ALJ relied on this erroneous "chaned in age category" in making his decision, and plaintiff does not raise this in her appeal, the Court finds that it amounts to harmless error.

Further, defendant contends that the ALJ's "accounting for" the single decision maker's opinion does not require remand.  For the reasons that follow, the matter is remanded to the Commissioner.

### 1.  Treating Physician Rule

Although a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and not inconsistent with other substantial evidence in the record.  <u>Veino v. Barnhart</u>, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 416.927(d).  Where the treating physician's opinion is contradicted by other substantial evidence, the ALJ is not required to give the opinion controlling weight.  <u>Halloran v. Barnhart</u>, 362 F.3d 28, 32 (2d Cir. 2004).  The ALJ must, however, properly analyze the reasons that the report is rejected.  <u>Id.</u>  An ALJ may not arbitrarily substitute his or her own judgment for competent medical opinion.  <u>Rosa v. Callahan</u>, 168 F .3d 72, 79 (2d Cir. 1999).

### a.  Dr. Clyde Satterly

In his RFC assessment, Dr. Satterly provided that plaintiff's diagnoses included Lupus, fibromyalgia, diabetes, hypertension,[8] and obesity.  T at 314.  He provided that plaintiff's prognosis was "permanent."  <u>Id.</u>  Her symptoms were reported as pain, swelling of the joints, fatigue, numbness, headaches, imbalance, frequent falls,

---

[8]  Dr. Satterly used the abbreviation HTN; however, based on the undersigned's careful review of the record, it appears that HTN is an abbreviation for hypertension.

forgetfulness, and lack of concentration. Id. Dr. Satterly indicated that plaintiff

experienced "pain in all joints but especially hands, feet[;] muscle tenderness, back

shoulder[,] legs due to fibromyalgia [;] activity precipitates pain, pain can be significant."

Id. Dr. Satterly identified the clinical and objective finds he used in making plaintiff's

diagnosis: confirmation of Dr. Neupane's diagnosis, "physical findings," and blood work.

Id. at 314. Dr. Satterly indicated that certain of plaintiff's prescriptions "can cause"

fatigue and nausea. Id. Dr. Satterly provided that plaintiff was not a malingerer and

that "emotional factors" did not contribute to plaintiff's symptoms and limitations. Id. at

315. He further provided that her impairments were reasonably consistent with her

symptoms and functional limitations. Id. Dr. Satterly indicated that her pain and other

symptoms were "frequently" severe enough to interfere with "attention and

concentration needed to perform even simple work tasks." Id. In answering a question

that asked "[t]o what degree can your patient tolerate work stress," Dr. Satterly

indicated that plaintiff was "[c]apable of low stress jobs." Id.

Dr. Satterly concluded that plaintiff could walk one block without rest or severe

pain, sit for up to fifteen minutes at one time, stand for up to fifteen minutes at one time,

and must alternate between "sitting/standing/lying down all day: cannot maintain

position for [greater than] 15 min." T at 315-16. Dr. Satterly provided that plaintiff

needed to include periods of walking around during a work day, and would need to walk

every fifteen to twenty minutes, for two to three minutes. Id. at 316. Further, plaintiff

needed a job that permitted shifting positions at will from sitting, standing, or walking,

and would need unscheduled breaks during an eight-hour work day. Id. He provided

that plaintiff could not perform any prolonged period of sitting.  Id.  Dr. Satterly indicated

that plaintiff did not need to use a cane or assistive device.  Id.  He opined that plaintiff

could occasionally lift less than ten pounds, but never lift ten pounds or more.  Id.  He

provided that plaintiff could never twist, stoop, crouch/squat, or climb ladders or stairs.

Id. at 317.  Dr. Satterly also provided that plaintiff's "hands are significantly affected due

to Lupus," and caused her limitations with "fastening buttons[;] tying shoes[;] computer,

phone, etc. are now difficult[;] used to play guitar but no longer can (sold all her elec.

guitar gear) [; and] even grooming (hair) is difficult[]."  Id.  Dr. Satterly indicated that

plaintiff's impairments were not likely to produce good days and bad days.  Id.  Finally,

he provided that plaintiff should avoid temperature extremes and humidity, as well as

sunlight.  Id.

The ALJ accorded Dr. Satterly's opinion "limited weight."  T at 16.  The ALJ

explained that he assigned this lesser level of weight because plaintiff "sought only

general treatment with him, throughout which time he hardly made any mention of the

alleged lupus and fibromyalgia."  Id.  Further, the ALJ found notable that Dr. Satterly, in

addressing the RFC admitted that plaintiff

> "sees Dr. Nu[epene] for these conditions [(lupus and
> fibromyalgia)] but he would not fill out her form even though
> he is the best one to answer these questions.  I will try my
> best to answer these questions as this patient has [nowhere]
> else to go to get this done."

Id.  The ALJ pointed out that, on the same day Dr. Satterly completed the RFC, "he

noted that [plaintiff] looked well and had no abnormalities, upon examination."  Id.

Observing that plaintiff testified that she could lift and carry a gallon of milk, and has

difficulty dialing a telephone and using a keyboard or mouse, the ALJ concluded that "this is somewhat inconsistent with the functional assessment in which the claimant reported that she can walk maybe five minutes and has to stop, sit, or lean on something to rest and she can stand in one spot [for] ten minutes." Id. The ALJ noted that plaintiff "also reported that she could still write [for] five to ten minutes with the right hand and even drove for fifty minutes to her consultative examination." Id. Thus, he surmised that "it appears that her activities of daily living were greater than she generally reported." Id.

Plaintiff first argues that the ALJ's decision is unsupported by substantial evidence insofar as he failed to discuss: (1) the frequency, length, nature, or extent of the treatment relationship with Dr. Satterly; (2) the medical evidence in support of Dr. Satterly's opinion; (3) the consistency between Dr. Satterly's opinion and other medical evidence in the record; and (4) Dr. Satterly's specialty. Dkt. No. 9 at 7.

Preliminarily, the Court notes that, despite plaintiff's claim that an ALJ must "explicitly *consider* the factors outlined in 20 C.F.R. 404.1527(c)," an ALJ is not required to explicitly *list* each factor. Dkt. No. 9 at 7 (emphasis added). Indeed, "it is well established that where an ALJ's reasoning and adherence to the Regulations is clear, he is not required to explicitly go through each and every factor of the Regulation." Leonard v. Commissioner of Soc. Sec., 14-CV-1353 (GTS/WBC), 2016 WL 3511780, at *3 (N.D.N.Y. May 19, 2016). Thus, declining to explicitly list each factor is not, without more, reversible error. Id. Insofar as plaintiff argues that the ALJ failed to

discuss Dr. Satterly's specialization, Dkt. No. 9 at 7,[9] the Court observes that the ALJ explicitly stated that Dr. Satterly is a primary care physician. T at 16, 17 ("In April 2013, *primary care physician*, Clyde Satterly, M.D. . . . ."; "Only her *primary care physician*, Dr. Satterly . . . .") (emphasis added). Thus, this argument is careless at best, and disingenuous at worst. Regardless, even if the ALJ had not stated that Dr. Satterly is a primary care physician, the argument would be without merit. It should be noted that a primary care physician is not considered a specialist; and, therefore, his opinions may be given less weight than a doctor who specializes in a field specific to a claimant's alleged conditions. See Thogode v. Colvin, 13-CV-1051 (DNH/TWD), 2015 WL 5158733, at *6 (N.D.N.Y. Sept. 2, 2015) (citing Barnett v. Apfel, 13 F. Supp. 2d 312, 316 (N.D.N.Y. 1998)).

Next, although plaintiff contends that the ALJ failed to consider the nature, extent, or frequency of her treatment relationship with Dr. Slatterly, the ALJ referred expressly to the nature of the treatment relationship insofar as he indicated that plaintiff "sought only general treatment" with Dr. Satterly. Dkt. No. 8 at 16. The ALJ also observed that "it appears that [plaintiff] sought more treatment with Dr. Neup[a]ne [than Dr. Satterly]." Id. In addition, the ALJ referred directly to Dr. Satterly's RFC, which indicates that Dr. Satterly began treating plaintiff in "about 2004," which demonstrates the length of the treatment relationship. Id. at 314. Therefore, it is reasonable for the

_____

[9] Plaintiff argues, "[i]n the instant case, the Administrative Law Judge does not discuss the frequency, length, nature or extent of treatment relationship; the medical evidence in support of the opinions; the consistency of the opinions with other evidence; and the specialty of Dr. Slatterly and Dr. Neupane." Dkt. No. 9 at 7.

Court to infer that, in reviewing the RFC and treatment record in detail, the ALJ

considered the nature and length of Dr. Satterly's treatment of plaintiff.  Although it may

have been more prudent of the ALJ to outright state the extent or length of plaintiff's

treatment with Dr. Satterly, by his referencing the nature of the treatment relationship,

and referring to the RFC – which indicates the length of the treatment relationship – and

treatment records, it is clear that this factor was considered; thus, compliance with 20

CFR § 404.1527(c) is met.

Plaintiff next argues that the ALJ did not consider the evidence supporting Dr.

Satterly's opinion, and whether the opinion "is well supported by medically acceptable

clinical and laboratory diagnostic technique."  T at 6.  The Court finds that the ALJ

properly considered the evidence in support of Dr. Satterly's findings.  The ALJ referred

to Dr. Satterly's examination performed on April 12, 2013, the same date Dr. Satterly

completed the RFC assessment.  Id. at 16 (citing T at 243-44).  The ALJ noted that,

despite the restrictions listed in Dr. Satterly's RFC, during the April 12, 2013

examination, plaintiff "looked well and had no abnormalities."  Id.  The ALJ also makes

general reference to his treatment notes, indicating that plaintiff sought "general

treatment" and that, during the course of Dr. Satterly's treatment of plaintiff "he made

hardly any mention of the alleged lupus and fibromyalgia."  Id. at 16.

As the ALJ notes, the majority of Dr. Satterly's treatment records with plaintiff are

not directly related to treatment of plaintiff's fibromyalgia or lupus.  T at 16.  The ALJ's

conclusion that Dr. Satterly largely provided plaintiff "general treatment"  is supported by

the record.  Id.  Of plaintiff's many visits to Dr. Satterly, she largely saw him for cold-like

14

symptoms (T at 268, 284), pain after falls (T at 245, 257, 286-87, 288, 292. 305, 310, 312); rashes (T at 295, 298), blood pressure (T at 262), and occasional blood sugar maintenance (T at 307). Although plaintiff often visited Dr. Satterly with complaints of pain and swelling, a close review of Dr. Satterly's treatment notes reveals that on the vast majority of occasions, plaintiff reported pain as a result of a fall or other trauma. Id. at 245 (left foot pain); 255, 257 (ear/jaw/cheek pain); 268 (ear pain); 273 (edema/swollen legs, no pitting); 281 (pain in right pinky toe when wearing shoes); 285 (pain in joints); 286 (left knee pain after fall); 289 (abdomen pain after fall); 292-93 (right arm pain/tenderness after fall); 303 (left shoulder/knee/hip pain after fall); 305 (back/right arm/right leg/hand/hip pain after fall); 310 (leg and right arm pain/numbness, leg parasthesia); 312 (right leg pain after fall); 365 (knee pain after fall). Review does not indicate that plaintiff sought treatment with Dr. Satterly for pain or swelling in her hands, or reported limited use of hands. Id. at 242-313. An ALJ may accord less weight to a treating physician where he comments on conditions for which he did not treat. See 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."); Doherty v. Astrue, 07-CV-954, 2009 WL 1605360, at *4 (N.D.N.Y. June 5, 2009) (noting that an ALJ may properly consider that the family care physician did not specialize in mental health in determining the weight to accord to her opinion on the plaintiff's mental status and limitations relating to her mental condition).

The ALJ also compared many Dr. Satterly's proposed limitations with record

evidence, and concluded that the opined limitations were not supported by "the objective [] longitudinal evidentiary record." T at 17. He specifically notes "minimal evidence of difficulties with the hands to the extent alleged." Id. The ALJ limited plaintiff to occasional use of her upper extremities to engage in overhead reaching, pulling, pushing, and lifting, and frequent use of the upper extremities to handle, grasp, finger, and feel bilaterally. Id. at 13. Although Dr. Satterly did not indicate a specific percentage of an eight-hour day that plaintiff could use her hands, fingers, and arms, he indicated that her hands were "significantly affected" and set out the daily activities that "are now difficult" for plaintiff. Id. at 317. Most of the activities Dr. Satterly listed as "difficult" for plaintiff related to fine manipulation, but he did indicate plaintiff's difficulty with doing her hair, which reasonably suggests difficulty with overhead reaching. Id. As the ALJ noted, these limitations appear based on plaintiff's reports to Dr. Satterly. Id. at 16. Although a treating physician may properly consider his or her patient's subjective complaints of pain or symptoms, but where the physician's objective tests are "unremarkable," an ALJ is not required to give that opinion controlling weight because such opinion cannot be said to be supported by medically-acceptable clinical and laboratory diagnostic techniques. Baladi v. Barnhart, 33 F. App'x 562, 564 (2d Cir. 2002) (quoting 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)); Lao v. Colvin, 14-CV-7507, 2016 WL 2992125, at *10 (E.D.N.Y. May 23, 2016) ("The Plaintiff does not point to any objective medical test results which the ALJ overlooked, and instead relies primarily on the Plaintiff's own subjective complaints, which do not, by themselves, provide the kind objective medical support required to trigger automatic deference under the treating

physician's rule.").

Despite frequent treatment with Dr. Satterly, there is no indication in his treatment records that plaintiff had substantial limitations on using her hands or arms. The ALJ explicitly reviewed Dr. Satterly's opined limitations and searched the record for objective medical evidence to support these limitations. For example, the ALJ points out that "Dr. Satterly even noted that 'on certain days' the claimant had issues with the hands, which is contrary to his functional limitations listed above." T at 17. The ALJ correctly observes that there is very little evidence within Dr. Satterly's medical records that support his limitations related to plaintiff's postural limitations or her ability to sit, stand, or walk. Although Dr. Satterly was aware of plaintiff's diagnoses and appeared apprised of her overall well-being as it related to the conditions, the vast majority of plaintiff's visits with Dr. Satterly were for issues such as colds or coughs, pain after experiencing falls, vertigo, rashes, and monitoring of blood sugar. Id. at 245, 251, 257, 262, 268, 273, 284-88, 291-92, 295, 298, 303, 305, 307, 310, 312. Although certain of these presentations could be related to plaintiff's Lupus or other conditions, Dr. Satterly did not indicate as such in the record. Notably, the Court can find no indication in any of Dr. Satterly's treatment notes relating to plaintiff having trouble with reaching or using her hands to manipulate objects.

The ALJ's finding here relating to her use of hands, and his decision to reject or accord less weight to Dr. Slatterly's limitations relating to plaintiff's use of her hands, is based on substantial evidence. Although plaintiff indicated that she could not perform fine finger manipulations during the hearing, and indicated that she could not dial a

phone or open containers, T at 38, 40.  The use of hands is significant because the VE

testified, in response to the ALJ's second hypothetical, that someone limited to

sedentary work, with only occasional ability to use the right upper extremity to handle,

finger, grasp, and feel, there would be no jobs in the national economy that such person

could perform.[10]   In sum, the ALJ thoroughly reviewed the other evidence in the record

and adequately explained his reasons for declining to afford Dr. Satterly's opinion

regarding plaintiff's limitations controlling weight and for according the opinion limited

weight.  See Cichocki v. Astrue, 534 F. App'x 71, 75 (2d Cir. 2013) (summary order)

("[S]ince the ALJ comprehensively explained the reasons for discounting Dr. Gupta's

medical source statement, he complied with the dictates of the treating physician rule.").

Next, plaintiff argues that the ALJ did not discuss the consistency of Dr.

Satterly's opinion with other medical evidence in the record as required by 20 C.F.R. §

404.1527(c)(2).  T at 6-7.  The Court disagrees insofar as the ALJ detailed his review of

nearly all of the treatment records of plaintiff's medical providers, including the

consultative provider.  See generally id. at 14-19.  Even if the ALJ did not directly

compare and contrast each opinion, he reviewed the supportability of each opinion in

detail.  First, in reviewing the other records that plaintiff suggests "support" Dr. Satterly's

opinion, the ALJ accorded limited weight to consultative examiner Dr. Lorensen's RFC

"due to its inconsistency with the objective examination findings of Dr. Lorsensen."  Id.

---

[10]  The additional parameters of the hypothetical were that the person could also occasionally use upper extremities to reach, push, pull and lift; occasionally use lower extremities to repetitively operate foot and leg controls; occasionally kneel, stoop, bend, and climb ramps/stairs; never climb ladders, ropes, or scaffolds; never crawl; and avoid concentrated exposure to extreme hot or cold temperatures, wetness, humidity, vibrations, and work hazards.  T at 45.

at 18.  Dr. Elke Lorensen found that plaintiff had marked restrictions in lifting, reaching, and bending, and moderate to marked restrictions in kneeling and squatting.  Id. However, she set no limitations on plaintiff's use of her hands, and, in fact, found that plaintiff had in tact hand and finger dexterity, full grip strength in both hands, and five out of five strength in her upper and lower extremities.  Id. at 18, 321.

Despite Dr. Lorensen's finding marked limitations in lifting and reaching, upon examination, plaintiff had full strength in both upper extremities, and full rotation of shoulders, elbows, forearms, and wrists.  T at 321.  Dr. Lorsensen noted that plaintiff had full flexion, extension, lateral flexion, and rotary movement of the cervical spine; flexion of forty degrees in the lumbar spine[11]; lateral flexion of ten degrees bilaterally; negative straight leg raises; sixty degrees leg extension bilaterally; no evident subluxations, contractures, ankylosis, or thickening; stable and nontender joints; no redness, heat, swelling, or effusion; and four positive trigger points at bilateral supraspinatus and bilateral trapezius.  Id. at 321.  Further, although plaintiff's gait was "abnormal" and she favored the right leg, her stance was normal, she did not need assistive devices, and she could get on and off of the exam table and rise from a chair without assistance.  Id. at 320.  Dr. Lorensen did not indicate that plaintiff had any restrictions on walking, standing, sitting, or carrying.  Id.  Accordingly, although Dr. Lorsensen's examination revealed some limitations in plaintiff's movement of her lumbar spine as well as four trigger points, it was reasonable for the ALJ to conclude

[11]  Plaintiff declined extension of her lumbar spine; declined walking on her heels and toes; and declined squatting.  T at 320-21.

that Dr. Lorensen's opined marked and moderate-to-marked limitations were inconsistent with the plaintiff's less severe "symptoms and signs" that she demonstrated during the examination.  Id.

To the extent plaintiff may imply that Dr. Ali Salah, M.D.'s treatment notes support Dr. Satterly's opined restrictions, such argument must fail because, as the ALJ points out, despite plaintiff's experiencing heart palpitations, swelling of the lower extremities, and uncontrolled hypertension, treatment notes indicate that Dr. Salah prescribed medications that appeared to reduce the severity and frequency of her palpitations and control her blood pressure.  T at 323, 325, 381-384.

The ALJ explicitly addresses imaging studies from orthopedist Dr. Matthew Scuderi, M.D., who plaintiff visited in October 2013 due to right knee pain.  T at 14.  The ALJ noted that the imaging studies of plaintiff's right knee "revealed some abnormalities and effusion.  Dr. Scuderi opined that the knee pain was degenerative and that the findings did not suggest that a single, unstable injury would cause pain."  Id.  The ALJ determined that Dr. Scuderi treated plaintiff conservatively, through a Depo-Medro injection.  Id.  The ALJ further provided that Dr. Scuderi provided "no functional limitations," and he accorded the opinion great weight.  Id.  During this visit, Dr. Scuderi diagnosed plaintiff with right knee lateral compartment, patellofemoral chondrosis.  Id. at 337.  Although the ALJ correctly indicates that Dr. Scuderi did not set out any functional limitations for plaintiff, this is not enough to conclude that Dr. Scuderi found that plaintiff has no functional limitations.  Indeed, Dr. Scuderi did not complete an RFC assessment.  Aceto v. Comm'r of Soc. Sec., No. 6:08-CV-169 FJS, 2012 WL 5876640,

at *16 (N.D.N.Y. Nov. 20, 2012) (citing Stytzer v. Astrue, 07-CV-811 (NAM/DEP), 2010

WL 3907771, at *6 (N.D.N.Y. Sept. 30, 2010) (stating that "[a] physician's statement is

not a functional analysis if it does not offer any information regarding the crucial factors

necessary to determine plaintiff's residual functional capacity.") (citations omitted)).

Although some cases have found that an ALJ may infer that a failure to set forth

limitations is an indicator that the provider believes there to be no functional limitations,

see, e.g., Samuel v. Commissioner of Soc. Sec., 13 Civ. 1939 (BMC), 2014 U.S. Dist.

LEXIS 163220, at *4-5 (E.D.N.Y. June 3, 2014), those cases relate to RFC

assessments where the examiner set forth certain limitations, but not others, whereas

here, Dr. Scuderi did not perform any functional assessment.  The ALJ accorded Dr.

Scuderi's "great weight."  T at 14.   However, although Dr. Scuderi did not set forth

limitations, the ALJ's indication of such appears harmless, as the ALJ accorded great

weight to Dr. Scuderi's opinion, and properly concluded that plaintiff's condition was

degenerative and appeared to be maintained with injection therapy.  See generally 20

C.F.R. § 404.1519(c)(6) ("Although we will ordinarily request, as part of the consultative

examination process, a medical source statement about what you can still do despite

your impairment(s), the absence of such a statement in a consultative examination

report will not make the report incomplete.").

     Moreover, as will be discussed in greater detail below, the ALJ also reviewed Dr.

Neupane's records. T at 15-17.   Although Dr. Neupane indicated that plaintiff was

limited to walking one to two blocks and that her symptoms would frequently interfere

with her ability to concentrate, he did not complete his RFC, and, thus, the lack of a

complete RFC cannot be said to either support or not support Dr. Satterly's opined restrictions.  Id. at 16.  However, the ALJ did note that Dr. Neupane repeatedly recommended that plaintiff engage in low-impact exercise in order to manage her weight, which he indicated impacts her pain.  Id. at 371-73.  In sum, the Court concludes that the ALJ properly applied this portion of the treating physician rule insofar as he compared Dr. Satterly's opinion with other medical evidence in the record.  20 C.F.R. 404.1527(c)(2).

Finally, plaintiff argues that, in giving limited weight to Dr. Satterly's RFC assessments, the ALJ improperly considered her activities of daily living, which she argues "does not constitute 'good reasons' for giving the opinion less than controlling weight."  Dkt. No. 9 at 7.  In support of this argument, plaintiff cites to, among other cases, Miller v. Colvin, 122 F. Supp. 3d 23 (W.D.N.Y. 2015).  In Miller, the ALJ gave little weight to the opinions of the plaintiff's treating psychiatrist and psychologist because the ALJ concluded that plaintiff was capable of certain activities of daily living, including fixing cars and overseeing his medical and psychiatric treatment.  Id. at 29. The Court noted that the ALJ misconstrued the record with regard to the plaintiff's ability to work on cars, and concluded that the plaintiff's limited activities did not demonstrate that he was able to "perform substantial gainful work at all exertional levels in a typical competitive workplace environment."  Id.

Here, although the Court acknowledges that comparing a plaintiff's reported activities of daily living with a medical provider's RFC assessment and lessen the weight accorded to that provider where the plaintiff's daily activities are suggestive of

greater abilities than those opined by the doctor; here, the Court agrees that plaintiff's activities of daily living should not have been relied on to accord "limited weight" to Dr. Satterly's opinion. Although ALJs must consider claimants' activities of daily living (20 C.F.R. §§ 404.1529(c)(3)(i)-(vii) and 416.929(c)(3) (i)-(vii)), "it is well-settled that '[s]uch activities do not by themselves contradict allegations of disability,' as people should not be penalized for enduring the pain of their disability in order to care for themselves." Knighton v. Astrue, 861 F.Supp.2d 59, 69 (N.D.N.Y. 2012) (quoting Woodford v. Apfel, 93 F. Supp.2d 521, 529 (S.D.N.Y. 2000)); see also Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir.1998) ("We have stated on numerous occasions that 'a claimant need not be an invalid to be found disabled' under the Social Security Act."). However, a plaintiff's activities of daily living may detract from her credibility where there are other reasons for skepticism. See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (affirming an adverse credibility judgement where the ALJ relied in part on the fact that the plaintiff "was able to care for his one-year-old child, including changing diapers, that he sometimes vacuumed and washed dishes, that he occasionally drove, and that he watched television, read, and used the computer.").

   Plaintiff's reported activities of daily living were fairly limited and did not indicate that she was capable of the degree of function set forth in the ALJ's RFC. See Woodford, 93 F.Supp. 2d at 529. In considering plaintiff's activities of daily living and balancing those against the medical RFCs, the ALJ noted that there appeared to be "inconsistencies in the alleged activities of daily living." T at 17. The ALJ noted that plaintiff testified that a friend helps her cut her toenails, take care of her hair, and help

with chores, and that she did not cook.  Id.  However, he noted that plaintiff testified that she shares chores with her family members, does laundry, and cooks.  Id.  He further noted that she provided that she showers twice per week, dresses daily, drives to the pharmacy and doctors appointments, and observed that she was able to drive the fifty minutes to her consultative examination, and "sat comfortably during the entire hearing."  Id. at 16-17.

Further, the ALJ stated that plaintiff's testimony that she carry a gallon of milk, has trouble dialing a telephone and using a keyboard and mouse was "somewhat inconsistent" with her report that she could walk five minutes before needing to rest and standing in one spot for ten minutes.  T at 16 at ¶4.  The ALJ also noted that plaintiff stated that she could write for five to ten minutes.  Id.  The Court is unable to comprehend how plaintiff's testimony that she is able to carry a gallon of milk and unable to use a phone, keyboard, and mouse is inconsistent with her report that she is able to walk for five minutes at a time and stand for ten.  Id.  To the extent that the ALJ intended to suggest that plaintiff's claims that she has had trouble using a phone, mouse/keyboard, and carrying more than a gallon of milk is inconsistent with her report of being able to write for five to ten minutes at one time, the Court notes that these actions are not necessarily contradictory.  Indeed, plaintiff reported difficulty using a mouse, keyboard, or phone due to numbness in her fingers, whereas she reported her ability to write for five to ten minutes at a time, but no more, was due to the loss of strength in her right hand.  Id. at 38.  Although being able to write for five to ten minutes may demonstrate an ability to use the hands to a certain extent for gripping, it

24

does not necessarily mean that she is able to use a keyboard, phone, or mouse. Further, insofar as plaintiff indicated that she could walk five minutes before needing to rest and stand in one spot for ten minutes, this is also not necessarily inconsistent with her being able to drive for fifty minutes to her exam or "sit comfortably" during the nearly one-hour hearing.[12]  T at 26, 50 (hearing began at 2:32 p.m. and ended at 3:25 p.m.). Although the driving for fifty minutes and sitting during the one-hour hearing may show that plaintiff has an ability to sit for longer than she indicated, her testimony on her ability to *walk* cannot be said to conflict with her *sitting* abilities.

In addition, plaintiff's statements regarding her limitations is largely consistent with other evidence in the record.  At the hearing, plaintiff provided that she was limited in her ability to walk, stating that she could walk for five minutes before needing to sit or lean on something.  T at 37.  She indicated that she gets dizzy and falls down easily due to her fatigue.  Id.  Plaintiff's fatigue and falls are well documented throughout the record.  Id. at 285-86, 288, 292, 303, 312.  Further, plaintiff has a handicapped sticker, and indicates that she uses a motorized cart when she goes to the store.  Id. at 36. Although she noted that she shares household chores with her brother and mother, when asked which chores she could actually complete, plaintiff indicated that she could do the laundry because "the caps are big on the laundry soap" and she has a "little stool that I just push around on wheels, so I can lock the wheels and sit and I can sort laundry or get in the dryer."  Id. at 40.  She provided that she cannot do the dishes

---

[12]  Although the Court acknowledges that plaintiff being able to sit in a car while driving for fifty minutes may demonstrate that plaintiff is able to sit for longer than she opined, at this portion of the determination, the ALJ does not mention plaintiff setting forth inconsistent activities of daily living relating to her sitting limitations.  See T at 16 ¶4.

because she "can't hang onto them" and "can't do the vacuuming because I can't stand and walk around." Id. She further provided that her mother or a friend will do the dishes. Id. at 39.

Although plaintiff's ability to drive for fifty minutes may suggest that plaintiff's sitting limitations are less severe than she indicated, plaintiff did provide that she only drives when she has to, such as to doctors appointments and the pharmacy, or in order to attend the required consultative examination. T at 37. Thus, as the only activities that appear to conflict with plaintiff's consistent statements of limitation and pain is her fifty-minute car ride to the consultative examination, an examination she had to attend in order to apply for benefits and sitting through the one-hour hearing, plaintiff's family limited and largely self-care activities of daily living do not support the ALJ's decision to accord limited weight to Dr. Satterly's RFC.

Accordingly, even if the ALJ found that plaintiff's reported activities of daily living indicated that she could perform more functions than those opined by Dr. Slattery, the ALJ does not provide the medical evidence he relied on in concluding that plaintiff could perform light work, even with the added limitations. As noted, to be able to perform light work, one must be able to lift up to twenty pounds. 20 C.F.R. 404.1567(b). The ALJ appears to have accepted plaintiff's claim that she could only carry a gallon of milk, which is clearly less than twenty pounds. To the extent that the ALJ rejected Dr. Satterly's opinion because plaintiff indicated that she could write for five to ten minutes, and her ability to drive to the consultative examination and sit during the hearing suggested that she was able to sit for fifty minutes to an hour at one time, the ALJ fails

to indicate how these abilities conflict with those limitations set out by Dr. Satterly that do not relate to her ability to sit or use her hands. "[W]hen a person chooses to endure pain on his [or her] own accord in order to participate in daily living activities, the ALJ should not 'hold this endurance against him [or her] in determining benefits unless his [or her] conduct showed that he [or she] is capable of working." Balsamo, 142 F.3d at 81-82 (internal citation omitted). Although the Court concludes that the ALJ largely applied the treating physician rule properly as it relates to Dr. Satterly, as discussed above, his use of plaintiff's activities of daily living to accord less weight to Dr. Satterly's findings is not based on substantial evidence where, excepting perhaps sitting and minimal use of hands, plaintiff's activities of daily living did not suggest that she was capable of the other limitations opined by Dr. Satterly or of the light work (with additional limitations) that the ALJ reached in his RFC.

Accordingly, as the matter must be remanded due to the ALJ's consideration of Dr. Neupane's opinion, as will be detailed below, on remand, to the extent the ALJ relies on plaintiff's reported activities of daily living in weighing the opinions of treating physicians or in assessing plaintiff's credibility, the ALJ must make clear to the Court the objective medical evidence he relied on in discounting the remainder of the opined limitations.

### b. Dr. Hom Neupane

In his RFC, Dr. Neupane,[13] plaintiff's rheumatologist, indicated that his

---

[13] In the ALJ's decision, he misspelled Dr. Neupane's name as Dr. Neupene. See T at 10-20.

frequency/length of contact with plaintiff was three to four months.[14]  T at 423.  Plaintiff's

diagnoses were "Lupus (mild)" and fibromyalgia.  Id.  Her prognosis was "variable."  Id.

Dr. Neupane indicated that plaintiff suffered from chronic pain.  Id.  Plaintiff takes

Plaquenil and prednisone, as needed, and Gabapentin.  Id.  Dr. Neupane prov ided that

plaintiff's symptoms are expected to last at least twelve months, and that she is not a

malingerer.  Id.  Dr. Neupane indicated that plaintiff's depression and anxiety

contributed to her symptoms and functional limitations.  Id.  Dr. Neupane opined that

plaintiff could walk one to two city blocks without rest or severe pain.  Id.  Dr. Neupane

did not indicate any other physical limitations and left the remainder of the form

incomplete, providing that plaintiff "needs functional capacity evaluation" which was "not

done at Rheumatology Clinic."  Id. at 423-24.

The ALJ accorded Dr. Neupane's July 2014 RFC limited weight.  T at 18.  The

ALJ cited the fact that Dr. Neupane's "frequency and length of contact with the claimant

was only every three to four months" as support for according lesser weight.  Id. at 16.

Further, the ALJ noted that Dr. Neupane indicated that plaintif f "only suffered from mild

lupus" and had a "variable" prognosis.  Id.  He also noted that Dr. Neupane did not

complete the functional assessment and indicated that plaintiff needed an functional

capacity evaluation performed.  Id.

As with Dr. Satterly's opinion, as it relates to Dr. Neupane, plaintiff argues that

the ALJ failed to discuss (1) the frequency, length, nature, or extent of the treatment

---

[14]  The Court reads this statement as indicating that Dr. Neupane saw plaintiff every three to four
months.

relationship; (2) the medical evidence in support of Dr. Neupane's opinion; (3) the consistency between Neupane's opinion and other medical evidence in the record; and (4) Dr. Neupane's specialty. First, the ALJ explicitly indicated that Dr. Neupane is a rheumatologist; thus, plaintiff's argument on this ground lacks merit. T at 15 ("From 2011 through July 2014, the claimant saw *rheumatologist*, Hom Neupene, M.D.)". Id. at 15. Similarly, although plaintiff contends that the ALJ did not consider the frequency, length, nature, or extent of the treatment relationship, the ALJ plainly set forth the length of plaintiff's treatment with Dr. Neupane, including "a significant gap in treatment," and cited records that spanned the entire period of treatment – December 2011, August 2010, April 2014, and July 2014. Id. The discussion of a selection treatment records from these varying dates is representative of the overall time span that plaintiff sought treatment with Dr. Neupane, as plaintiff sought treatment with Dr. Neupane beginning in 2011. Id. Thus, the ALJ's explicitly reference to the length of treatment, his citing and discussing treatment records from 2011 to 2014, and his reference to the RFC which indicates that Dr. Neupane saw plaintiff every three to four months clearly acknowledges the length, frequency, nature, and extent of Dr. Neupane's treatment relationship with plaintiff. Id. at 423. Thus, this argument is plainly incorrect as even the most cursory reading of the ALJ's determination would demonstrate his consideration of this factor.

Thirdly, plaintiff argues that the ALJ failed to discuss the medical evidence in support of Dr. Neupane's opinion. Dkt. No. 9 at 7-8. The ALJ provided that he gave Dr. Neupane's opinion limited weight because Dr. Neupane treated plaintiff only every three

to four months, indicated that plaintiff suffered from mild lupus and had a variable prognosis, and because he failed to complete the RFC. T at 17-18. The ALJ discussed an August 2012 visit with Dr. Neupane wherein plaintiff reported pain in her hands, feet, and ankles, and tingling and numbness. Id. at 15. Plaintiff also reported drowsiness and poor sleep from Gabapentin, but that Plaquenil "helped to some degree." Id. Plaintiff had eighteen out of eighteen tender points, and crepitus in the knees. Id. Dr. Neupane believed plaintiff's symptoms to be related to neuropathy, not active inflammatory arthritis. Id. The ALJ noted that, "despite the claimant's symptoms and Dr. Neup[a]ne's statement, the objective findings hardly changed over time, even when the claimant had no flare ups due to lupus." Id. It is not clear to the Court what the ALJ means by this statement. However, it possible that the ALJ is suggesting that Dr. Neupane did not change his prognosis or treatment approach, even when plaintiff appeared to be improving.

The ALJ also discussed Dr. Neupane's February 13, 2013 treatment note where plaintiff reported "some degree" of relief with Plaquenil. T at 15 (citing T at 374). The Court does note that the ALJ did not discuss that at later, more recent visits, plaintiff reported that Plaquenil was not helping her pain. Id. at 396 (April 27, 2014 visit), 402 (July 4, 2014 visit). Thus, the ALJ's selection of treatment notes indicating that the medication had some benefit toward plaintiff in easing her pain is not fully accurate because other treatment notes suggest the medication did not provide plaintiff with relief. To the extent the ALJ relied on his mistaken belief that plaintiff continued to experience some pain relief with Palquenil, such amounts to a selective reading of the

record, which is not a "good reason" for according less weight to the treating physician.

See, e.g., Tim v. Colvin, 12-CV-1761(GLS/ESH), 2014 WL 838080, at *8 (N.D.N.Y.

Mar. 4, 2014). "It is axiomatic that a full and fair hearing in accordance with beneficent

purposes of the Social Security Act requires consideration of all relevant evidence."

Id. at *7 (citation omitted). On remand, to the extent the ALJ relies on any pain relief

plaintiff may have obtained through use of her prescription medication or relies on this

relief in determining the weight to accord to the various medical opinions, the ALJ must

consider the full evidentiary record in assessing whether plaintiff obtained pain relief

through her prescription medication or other treatments.

The ALJ next referenced an April 2014 visit with Dr. Neupane, where plaintiff

reported aches, pains, fatigue, and rashes, "but admitted that she had good blood

sugar levels." T at 15. Dr. Neupane

> noted that the claimant had a flare up of lupus with oral
> ulcers, rashes, and more fatigue, and thus increased her
> dosages of Plaquenil, Meloxicam, and Gabapentin, and
> added Methotrexate. By July 2014, Dr. Neup[a]ne added
> Perdnisone to take on an as needed basis for lupus but
> continued with conservative treatment.

Id. Insofar as the ALJ indicates that plaintiff underwent conservative treatment with

plaintiff, the record does not support this finding. Although it is true that Dr. Neupane

defined plaintiff's Lupus as "mild,"[15] and that plaintiff underwent conservative treatment

---

[15] In order to "simplify therapy, SLE should be classified as mild (eg, fever, arthritis, pleurisy, pericaditis, headache, rash) or severe (eg, hemolytic anemia, thrombocytopenic purpura, massive pleural and pericadial involvement, significant renal damage, acute vasculities of the extremities or GI tract, florid CNS involvement." THE MERCK MANUAL OF DIAGNOSES AND THERAPY 308 (19th ed. 2011). For "mild or remittent disease,"

> [l]ittle or no therapy may be needed. Artralgias are usually controlled with

with Dr. Neupane, the ALJ does not explain why plaintiff's course of medication from Dr. Neupane is considered conservative treatment, as there is no evidence that more aggressive treatment options were available or determined to be medically appropriate for plaintiff. See generally Lively v. Colvin, 16-CV-5594 (JRC), 2017 WL 65316, at *1 (W.D. Wa. Jan. 6, 2017) ("[A]lthough the ALJ characterized plaintiff's treatment as "conservative," nothing in the record reflects that more aggressive treatment options were appropriate or available.).

Similarly, the ALJ appears to accord limited weight to Dr. Neupane's RFC because he concluded that plaintiff's Lupus was "mild" and her diagnosis was "variable." T at 16. However, it is well settled that Lupus and fibromyalgia are capricious and unpredictable conditions with periods of flares and periods where the patient is asymptomatic. THE MERCK MANUAL OF DIAGNOSES AND THERAPY 305 (19th ed. 2011) ("Clinical findings vary greatly. SLE may develop abruptly with fever or insidiously over months or years with episodes of arthralgias and malaise . . . . Manifestations referable to any organ system may appear. Periodic exacerbations (flares) may occur."); see also Soc. Sec. Law and Practice, § 42.88 n.1 ("Systemic lupus erythematosus . . . is a multisystem disease of unknown etiology with a highly variable course."). To accord Dr. Neupane's RFC limited weight because he noted that plaintiff's prognosis is "variable" – which suggests that plaintiff's condition will vary

_____

NSAIDs. Antimalarias help, particularly when joint and skin manifestations are prominent. Hydroxychloroquine 200 mg po once/day or bid reduces the frequency of SLE flares. Alternatives include chloroquine 250 mg po once/day. Hydroxychloroquine can rarely cause retinal toxicity. The eyes should be examined at 12-mo intervals.

Id.

based on whether she is experiencing a flare up of lupus or fibromyalgia – is inappropriate because the very nature of this conditions is varying. T at 423.

Finally, to the extent the ALJ accorded Dr. Neupane's opinion limited weight because he did not provide a complete RFC, the ALJ should have reached out to Dr. Neupane to obtain such an assessment. As the ALJ observes, the only RFC in the record is from Dr. Satterly, who did not treat plaintiff for the conditions which appear to cause the majority of her alleged functional limitations and symptoms – Lupus and fibromyalgia. The doctor who was in the best position to provide such an assessment, Dr. Neupane, did not complete this assessment. Thus, once the ALJ rejected Dr. Satterly's RFC, the ALJ was without a medical opinion in the record regarding plaintiff's physical limitations.

The ALJ has an "affirmative duty to develop the record and seek additional information from the treating physician, sua sponte," to determine upon what information the treating source was basing his opinions. Colegrove v. Commissioner of Soc. Sec., 399 F. Supp. 2d 185, 196 (W.D.N.Y. 2005). Additional evidence or clarification is sought when there is a conflict or ambiguity that must be resolved, when the medical reports lack necessary information, or when the reports are not based on medically acceptable clinical and laboratory diagnostic techniques. See 20 C.F.R. § 404.1512(e)(1). It is the ALJ's duty to fully develop the record. See Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999). The regulations provide that before a disability determination is made, the Commissioner will develop the complete medical history

> [F]or at least the 12 months preceding the month in which
> you file your application unless there is a reason to believe

that development of an earlier period is necessary or unless
you say that your disability began less than 12 months
before you filed your application. We will make every
reasonable effort to help you get medical reports from your
own medical sources when you give us permission to
request the reports.

20 C.F.R. § 404.1512(d). "Reasonable effort" according to the regulations means that

the Commissioner will make an initial request for evidence from a medical source and,

if such evidence is not received in ten to twenty calendar days, one follow-up request

will be made, after which the medical source will be afforded an additional ten days to

respond. Id. § 404.1512(d)(1). Here, the ALJ provides no evidence that he made a

reasonable effort to obtain a full RFC from Dr. Neupane, the specialist and treating

provider who was in the best position to provide an assessment of plaintiff's functional

limitations. The ALJ discounted, in part, Dr. Satterly's opinion because plaintiff sought

only general treatment with him, yet the ALJ did not make efforts in order to contact the

doctor with whom plaintiff specifically sought care for her lupus and fibromyalgia.

Accordingly, the ALJ did not meet his duty of fully developing the record as the record

lacks an RFC by a doctor familiar with these conditions. Therefore, on remand, the ALJ

must make reasonable efforts to obtain a statement of plaintiff's functional limitations

from Dr. Neupane or another physician who is most familiar with plaintiff's lupus and

fibromyalgia.

### 2. Single Decision Maker

The ALJ's brief discussion of the opinion of a Disability Determination Services

single decision maker ("SDM") is as follows: "[a] Disability Determination Services single

decision maker evaluated the claimant for a functional assessment. While a single decision maker is an unacceptable medical source, I have nonetheless accounted for this evaluation in assessing the severity of the claimant's alleged conditions." T at 18. The SDM concluded that plaintiff had the severe impairments of systemic lupus erythematosus and fibromyalgia, which could reasonably be expected to produce plaintiff's pain and other symptoms, but that plaintiff's statements about the intensity, persistence, and functionally limiting effects of the symptoms are not substantiated by the objective medial evidence. Id. at 54-55. The SDM further concluded that plaintiff's allegations were credible, but her symptoms were not credible to the degree alleged. Id. at 55. The SDM limited plaintiff to occasionally lifting and carrying ten pounds and frequently lifting or carrying less than ten pounds; standing or walking for two hours in an eight-hour work day, with normal breaks; sitting for six hours in an eight hour work day, with normal breaks; unlimited pushing and pulling abilities; unlimited ramp/stair climbing; frequent climbing of ladders/ropes/scaffolds; and unlimited balancing, stooping, kneeling, crouching, and crawling. Id. at 55-56. The SDM set forth no environmental limitations. Id. The SDM determined that plaintiff was not limited to unskilled work, and concluded that she could also perform sedentary work. Id. at 58. Ultimately, the SDM determined that plaintiff was not disabled. Id. at 59.

In support of her argument that the ALJ erroneously "acknowledged" this opinion plaintiff refers the Court to Hart v. Astrue, 32 F. Supp. 3d 227 (N.D.N.Y. 2012), where Senior District Judge Thomas J. McAvoy determined that the ALJ erroneously accorded the SDM's opinion "minimal weight," and that it should not have accorded it "any

evidentiary weight at the hearing level." Id. at 229.   The Court observed that the plaintiff's treating physician concluded that the plaintiff should avoid lifting more than fifteen pounds, as well as performing pushing or pulling.  Id.  The Court noted further that

> because the consultative examiner opined on that Plaintiff 'has mild to moderate limitation lifting, carrying, pushing, and pulling,' but the disability analyst concluded that Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand/walk six hours a day, and was on limited[16] in his ability to push/pull, it appears that the ALJ's conclusion was based, at least in part, on the disability analyst's opinion and not on Plaintiff's treating physician's opinion which should have been afforded controlling weight.

Id. at 230 (internal record citations omitted).

Plaintiff argues that, here, (1) "it is unclear how the [ALJ] 'accounted for' the SDM's evaluation; therefore, it is impossible to determine the ultimate effect on the determination"; (2) "the evaluation of the opinion as evidence deprives [plaintiff] of the de novo nature of an [ALJ] hearing as the [SDM] is putting forth an initial assessment of the claim"; and (3) "in accounting and treating the opinion as an unacceptable medical source ([w]hereas it is actually produced by a non-medical source) in formulating an [RFC], it detracts from the other actual medical opinions of record such as that of Dr. Hom Neupane and Dr. Clyde Satterly." Dkt. No. 9 at 9.

Defendant argues that the case at hand differs from Hart because

---

[16] Here, it appears that "on limited" is a typographical error, and that the decision was to read "unlimited." Hart, 32 F. Supp. 3d at 230.  Indeed, reference to the cited portion of the case's administrative transcript shows that the consultative examiner indicated that the plaintiff was "unlimited" in his ability to push or pull.  Hart v. Astrue, No. 11-CV-119 (ATB/VEB), Dkt. No. 603, Administrative Transcript at 217.

> the ALJ did not give even minimal weight to the evaluation of the SDM. Instead, the ALJ merely acknowledged, correctly, that an ADM is not an acceptable medical source, and stated that he 'accounted' for the evaluation in the RFC finding. The fact that the ALJ took the SDM's finding into account means that he considered it, not that he gave it any significant weight or even minimal weight.

Dkt. No. 11 at 19.

SDMs are "non-physician disability examiners who may make the initial disability determination in most cases without requiring the signature of a medical consultant." Lozama v. Colvin, No. 13-CV-20, 2016 WL 1259411, at *5 (N.D.N.Y. Mar. 30, 2016) (quoting Hart, 32 F. Supp. 3d at 237). Here, unlike in Hart where the ALJ explicitly indicated that he gave the SDM "minimal weight," ALJ Brinkley did not indicate that he gave the opinion of the SDM any weight; rather, he indicated that he "accounted for" the evaluation in assessing the severity of plaintiff's conditions. T at 18. The ALJ's objected-to language is identical to that used by the same ALJ, Joseph Brinkley, in Kotary v. Commissioner of Soc. Sec., 16-CV-90 (ATB), 2016 WL 6684224, at *6 (N.D.N.Y. Nov. 14, 2016), where the plaintiff[17] argued that the ALJ inappropriately "accounted for" the SDM's opinion. There, the plaintiff argued, as plaintiff does here, that the ALJ committed reversible error because "the SDM is not a medical source at all, rather than an 'unacceptable one.'" Id. Magistrate Judge Baxter 'acknowledged that the ALJ's terminology may have been incorrect" as the "proper statement is that an SDM is not an acceptable medical source, rather than an 'unacceptable' medical

---

[17] The Court notes that the plaintiff in Kotary was represented by the same counsel as plaintiff in the case at bar, Steven R. Dolson, Esq.

source." Id. (citing <u>Lozama</u>, 2016 WL 1259411, at *5).  However, Judge Baxter noted

> that the regulations specifically provide that the ALJ may
> consider 'other sources to show the severity of your
> impairment(s) and how it affects your ability to work.'  20
> C.F.R. §§ 404.1513(d), 416.913(d).  These sources include
> 'but are not limited to' medical sources who are not listed as
> 'acceptable;' educational personnel; public and private social
> welfare agency personnel; and 'other' non-medical
> sources[:] spouses, parents, other caregivers, siblings, other
> relatives, friends, neighbors, and clergy.'  Id. §§
> 404.1513(d)(1)-(d)(4), 416.913(d)(1)-(d)(4).  An SDM would
> fit into the 'non-medical' source category.  Thus, although
> the non-medical source may not be used to establish an
> impairment or to contradict a physician's opinion, the
> regulations do contemplate such consideration, and the
> ALJ's reference to the SDM, particularly when he accepted
> that the SDM was not an acceptable medical source and did
> not rely solely on the SDM's opinion to determine plaintiff's
> RFC is not error.  Even if it was error, it was harmless.

Id. at *6 n.8.

The Court also noted that the ALJ's indicating the SDM's opinion as "accounted

for" was, at most, harmless error as it was "clear that the ALJ did not simply accept the

RFC determination make [sic] by the SDM."  Id.  at *7; <u>see</u> <u>also</u> <u>Lozama</u>, 2016 WL

1259411, at *6 (finding that even if the ALJ improperly accepted the SDM's opinion, "it

would not lead to a finding of disability" as the SDM concluded that the plaintiff could

perform light work without exposure to hazards, and the VE identified existing light work

without exposure to hazards that the plaintiff could perform).  Where the SDM in

<u>Lozama</u> concluded that the plaintiff could perform a full range of light work, the ALJ's

RFC "included several more significant limitations that were suggested by the record

and plaintiff's testimony."  Id.

The Court agrees that the ALJ's statement that the SDM was an "unacceptable

medical source" whose opinion he "accounted for," without more, is not reversible error. T at 18.  Indeed, although the ALJ improperly referred to the SDM as a medical source, he did indicate that such source is not entitled to any evidentiary weight.  Further, he indicated that he accounted for the opinion in assessing the severity of plaintiff's conditions, and it is permissible for an ALJ to consider non-medical source opinions in assessing the severity of conditions.  See 20 C.F.R. §§ 404.1513(d)(1)-(d)(4), 416.913(d)(1)-(d)(4).  However, this error is only harmless if, as in Kotary, it is clear that the ALJ did not actually rely on the SDM's opinion in making his RFC assessment.

This case differs from Kotary in a subtle but significant way.   In Kotary, the Court concluded that it was clear that the ALJ did not accord any weight to the SDM, as the ALJ adopted an RFC that was more restrictive than the SDM's.  Kotary, 2016 WL 6684224, at *7; see also Robles v. Commissioner of Soc. Sec., 15-CV-1359 (GTS), 2016 WL 7048709, at *5 (N.D.N.Y. Dec. 5, 2016) (concluding that ALJ's erroneous reference to the SDM as an "unacceptable medical source" and notation that he "accounted for" the SDM's evaluation did not warrant remand because (1) the ALJ's reference to the SDM as an "unacceptable medical source . . . implies that the ALJ was aware that the SDM was not to be afforded any weight" and (2) the RFC is supported by substantial medical evidence independent of the SDM's evaluation).  However, here, it is less clear whether the ALJ relied on the opinion.  Here, although the ALJ's RFC offers some greater restrictions than the SDM's relating to postural limitations and use of the upper and lower extremities, the SDM opined that plaintiff could perform

sedentary work,[18] whereas the ALJ concluded that plaintiff could perform light work, with a few restrictions.  T at 13.  Despite adopting a generally less restrictive RFC, it is not clear that the ALJ assigned no medical weight to the SDM's opinion because the only other medical opinions in the record that provided an RFC – Dr. Neupane, Dr. Satterly, and consultative examiner Dr. Elke Lorensen – suggested far more significant restrictions.  Thus, it is entirely possible that, rather than just acknowledging the existence of the SDM's decision in the record, the ALJ accorded it weight.  Indeed, as discussed elsewhere in this Decision and Order, Dr. Neupane's RFC, albeit incomplete, set forth significant restrictions on plaintiff's ability to walk; Dr. Satterly set forth marked limitations in walking, sitting, standing, concentration, lifting, postural, use of hands, and temperature extremes; and Dr. Lorensen proposed marked restrictions in lifting, reaching, and bending, and moderate to marked restrictions in kneeling and squatting.  See generally T at 10-20; 314-18; 423-24.  Thus, both Dr. Satterly and Dr. Neupane opined significant limitations in plaintiff's ability to sit, stand, and walk for extended periods of time, and both indicated that plaintiff's pain and symptoms would be severe enough to impact her attention and concentration.  See id. at 314-18; 423-24.  Thus, the ALJ is setting forth his RFC without reliance on any medical opinion regarding her limitations.  Although the ALJ does reference treatment records that he believes are

---

[18]  Although the SDM did not state sedentary work, she indicated that plaintiff could lift and carry no more than ten pounds, and stand or walk for up to two hours in an eight-hour work day.  See 20 C.F.R. 404.1567(a)( "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary to carry out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."); Rosa v. Callahan, 168 F.3d 72, 78 n.3 (2d Cir. 1999) ( "Sedentary work . . . generally involves up to two hours of standing or walking and six hours of sitting in an eight-hour work day.") (internal quotation marks omitted)).

inconsistent with the proposed RFC, he draws conclusions from these records that are not drawn from a medical opinion.

As it is not entirely clear whether the ALJ accorded evidentiary weight to the SDM, and this matter must be remanded for reconsideration and recontacting of treating physician Dr. Neupane and the consideration of plaintiff's activities of daily living, on remand, the ALJ must explicitly state the reliance, if any, he placed on the SDM's opinion.

### III.  Conclusion

Having reviewed the administrative transcript and the ALJ's findings, for the reasons stated herein, the undersigned concludes that the Commissioner's determination is not supported by substantial evidence.

**WHEREFORE**, for the reasons stated above, it is hereby

**ORDERED** that the Commissioner's motion for judgment on the pleadings (Dkt. No. 11) be **DENIED**, that plaintiff's motion for judgment on the pleadings (Dkt. No. 9) be **GRANTED**, and that the Commissioner's decision denying disability benefits be **REMANDED**, pursuant to sentence six of 42 U.S.C. § 405(g), to the Commissioner for further proceedings consistent with Decision and Order; and it is

**ORDERED**, that copies of this Decision and Order be served on the parties..

**IT IS SO ORDERED.**

Dated: March 6, 2017
      Albany, New York

Christian F. Hummel
U.S. Magistrate Judge